# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# AT LOUISVILLE

NANCY SIEGEL                                                                    PLAINTIFF

V.                                                                    NO. 3:08CV-00429-S

KENTUCKY FARM BUREAU
MUTUAL INSURANCE COMPANY                                  INTERVENOR PLAINTIFF

V.

FISHER & PAYKEL APPLIANCES
HOLDINGS LTD., et al.                              DEFENDANTS/THIRD-PARTY PLAINTIFFS

v.

BURNER SYSTEMS
INTERNATIONAL, INC.                                             THIRD-PARTY DEFENDANTS

## MEMORANDUM OPINION

Third-party defendant, Burner Systems International, Inc. ("Burner Systems") has filed a motion for summary judgment on the sole claim against it in this litigation, specifically a claim for common-law indemnity asserted by the defendants/third-party plaintiffs ("DCS"). For the reasons stated more thoroughly below, the court will grant Burner Systems' motion.

**I.**

The plaintiff, Nancy Siegel, was injured while she was using a propane gas range manufactured by the defendants, Dynamic Cooking Systems, Inc. and Fisher & Paykel Appliances Holdings Ltd. (collectively, "DCS"). Plaintiff sued DCS; her insurance company promptly intervened; and then DCS asserted a third-party claim for common-law indemnity against Burner Systems, which supplied a gas regulator for use as a component part of the range.

Ms. Siegel, and her insurance company did not subsequently amend their pleadings to assert claims directly against Burner Systems, however.

There is no dispute among the parties that the explosion and fire that caused Ms. Siegel's injuries most likely was caused by a leak in the gas regulator supplied by Burner Systems. Nor is there any dispute among the parties that there was no defect in the *design* of the gas regulator. Rather, the factual dispute focuses on whether a *manufacturing* defect, or some other factor, caused the regulator to leak. Determining an answer to this question has been significantly hampered, however, by the extensive damage to the regulator that occurred during the accident.

Burner Systems asserts, and no party has disagreed,[1] that all regulators manufactured by Burner Systems are tested for leaks before they leave the manufacturing facility, and are not shipped if they leak. Further, the evidence shows that the regulator at issue here was tested by DCS after it was assembled in what became Ms. Siegel's range and determined to be leak free. Lastly, there is no evidence that the regulator at issue leaked during the thirteen months that Ms. Siegel owned her range.[2]

As is typical practice in product liability actions, the parties retained experts to help them determine the cause of the accident. DCS has identified Mark Mulcahy of SEA Ltd. Both Ms. Siegel and Kentucky Farm Bureau have identified Miranda Hewlett and David Riggs of Donan Engineering, which was hired by Ms. Siegel's insurer, intervening plaintiff Kentucky Farm Bureau, to investigate the accident. Burner Systems retained and identified Thomas Crane of Crane Engineering. While, as noted above, all of the experts agree that the probable source of

---

[1] Ms. Siegel noted, however, that, although it was the customary practice of both DCS and Burner Systems to leak test all regulators, there is no specific documentation confirming that the regulator at issue in this case individually had been tested.

[2] Ms. Siegel testified that, until the day of the accident, her range performed properly and she had never smelled propane gas in her house.

the leak that caused the explosion was the Burner Systems regulator, none of the experts states unequivocally, in their reports or deposition testimony, that the probable cause of the leak in the regulator was a manufacturing defect with respect to the regulator itself.

Mr. Mulcahy, DCS's expert, states that a manufacturing defect was one of three *possible* causes of the regulator's leak, but notes in bold type in his report that, "[d]amage to the regulator was sufficient so as to preclude identifying a specific scenario for development of leakage at the onset of the event," (Mulcahy Rep't, March 19, 2010). During his deposition, and with laudable candor, he stated:

> I don't think you can tell by looking at that regulator that there's evidence of a manufacturing defect on the seal that attributed to this incident...you simply can't tell, there's so much damage to that regulator. You simply can't tell what – what the issue was.

(Mulcahy Dep., May 12, 2010, at 47, lines 11-14, 21-24.) And, when questioned about a specific type of manufacturing defect that he theorized could have caused a leakage problem, he agreed that his theory was only a possibility, and that he could not state with certainty that it was the *probable* cause of the leak. *Id.* at 48, lines 17-23.

By contrast, Thomas Crane, Burner Systems' expert, concludes that the evidence does not support a conclusion that the manufacture of the *regulator* was defective. Instead, he opines that placement by DCS of the regulator in an area of the range in which temperatures were in excess of the maximum specified temperature for the regulator contributed to the "degradation of the perimeter diaphragm seal" and "contributed to the leak." (Crane Rep't, Dec. 28, 2009, at 11.) In other words, although not explicitly stated as such, a defect in DCS's design or manufacture of the range could have caused a component part of the regulator to degrade, thereby causing leak. *Id.* at 10-11.

-3-

The first report initially prepared by Donan Engineering on behalf of Kentucky Farm Bureau unequivocally states, but in a conclusory manner without specific support: "The cause of the fire is a manufacturer's defect. No sign of improper installation[3] was found." (Hewlett and Riggs Rep't, Aug. 8, 2008, at 5). The report's summary of conclusions also states, but again in largely conclusory fashion:

> The cause of the fire is manufacturer's defect. This is based on the following facts:
>
> 1. The range failed under normal operating conditions after approximately one year of use.
> 2. The gas regulator leaks.
> 3. No evidence of abuse to the regulator was found.
> 4. No sign of an improper installation[4] was found.

*Id.* at 6. Significantly, however, the report does not specify the precise nature of the alleged manufacturing defect, or specifically how Donan's experts concluded a defect in fact existed. Neither does the report identify *which* manufacturer caused the defect: DCS, which manufactured the range, or Burner Systems, which manufactured the component part.

One could infer that Donan meant the manufacturer of the regulator, since its experts noted that "[t]he gas regulator leaks," but "[n]o evidence of abuse to the regulator was found." *Id.* But, in Donan's supplemental report, David Riggs interprets Mr. Crane's report as concluding that there exists a design defect in the range itself and notes that, if one accepts the measurements and observations in Crane's report as accurate, Crane's conclusions about "the failure mode" and his "rebuttal of Mr. Mulcahy's report" (*i.e.*, that any manufacturing defect was DCS's, not Burner Systems') are consistent with the evidence observed by Donan. (Riggs Rep't,

---

[3]Although not stated specifically, when one reads the report as a whole, the most reasonable interpretation of this sentence is that "no sign of an improper installation [of the range itself, as opposed to its component parts] was found."

[4]*See* note 3, supra.

-4-

April 19, 2010.) This suggests the defect Donan identifies is with the DCS range, not the Burner Systems regulator.

In summary, although all expert and trial counsel agree that a leaky regulator caused the accident that injured Ms. Siegel, there is no expert for any party who has concluded that a manufacturing defect with respect to the regulator supplied by Burner Systems is the *probable*, as opposed to one of a few *possible*, causes of the leak that caused the accident. The court will now determine what effect this has on DCS's claim for indemnity.

## II.

The legal standard for granting summary judgment in federal court, and the differences between the federal and Kentucky standards, are oft-repeated and need not be called to the attention of the experienced and knowledgeable trial counsel in this matter. Suffice it to say that the court will construe the evidence in the light most favorable to the non-movant and evaluate whether there exist any material issues of fact.

The standards for granting common-law indemnity under Kentucky law bear more discussion, however. In Kentucky, common-law indemnity is an equitable remedy awarded by the court, as a matter of law, and is "available to one exposed to liability because of the wrongful act of another with whom he/she is not *in pari delicto*." *Degener v. Hall Contracting Corp.*, 27 S.W.3d 775, 780 (Ky. 2000); *see also Thompson v. The Budd Company*, 199 F.3d 799, 806-07 (6th Cir. 1999). The burden of establishing another's greater liability, which in this case is product liability, is on the person seeking indemnity. *See Ashland Oil & Refining Co. v. Gen'l Tel. Co.*, 462 S.W.2d 190, 193 (Ky. 1970).

Under Kentucky's law of product liability, the plaintiff has the burden of proving that a
-5-

particular product is defective in either its manufacture or design. *See, e.g.,Clark v. Hauck Mfg*, 910 S.W.2d 247, 250 (Ky. 1995)(*overruled on other grounds* by *Martin v. Ohio County Hosp. Corp.*, 295 S.W.3d 104 (Ky. 2009)). By extension, then, the burden is on DCS as an indemnity claimant, as it must establish that a defect in Burner Systems' regulator caused the accident. *Cf. Degener,* 27 S.W.3d 780 (indemnity claimants must establish another party's greater fault)*; Ashland Oil*, 462 S.W.2d at 193 (the burden is on indemnity claimants to establish liability to the plaintiff).

As the court noted above, the parties agree that there is no evidence to support a claim of *design* defect with respect to the Burner Systems regulator. Thus, to satisfy the requirements for a successful indemnity claim, DCS must establish that a *manufacturing* defect in the regulator. *See Hauck Mfg.*, 910 S.W.2d at 250. To do so, DCS may use circumstantial evidence, but it its evidence must "support a reasonable inference that a manufacturing defect in the regulator was the 'probable' cause of the accident as distinguished from a 'possible' cause among other possibilities." *Greene v. B.F. Goodrich Avionics Systems, Inc.*, 409 F.3d 784, 793 (6th Cir. 2005)(citing *Midwestern V.W. Corp. v Ringley*, 503 S.W.2d 745, 747 (Ky. 1973), and applying Kentucky law generally). Kentucky common law and applicable Sixth Circuit case law are clear: he finder of fact cannot be asked to speculate, suppose, or surmise that there was a manufacturing defect. *Id.*

Therein lies the crux of the problem for DCS. Its own expert, who appears to be honest and forthright in his technical analysis, has admitted that, because the regulator was so severely damaged, he cannot conclusively establish a manufacturing defect. He clearly believes that a defect is possible, but remained true to his scientific principles, and agreed that he could not,

given the facts and data before him, state that a manufacturing defect in the regulator itself was the *probable* cause of the accident. Consequently, DCS is effectively without its own expert's support for its claim. *See Greene*, 409 F.3d at 793 (a probable cause must be isolated from among the possible causes).

DCS asserts, however, that it is not necessary for its expert to isolate a probable cause for it to prevail on the issue of the regulator's putative manufacturing defect. Although DCS has been very careful in its arguments before the court and in its pleadings to use the phrase "*res ipsa loquitur*" it has nonetheless asserted that the circumstances of the accident speak for themselves. According to DCS, its expert's testimony is not necessarily required, because it would be within the realm of the jury's common experience to determine that it is reasonable to conclude that the product was defective simply because an unusual or unexplained event occurred in a case such as this one in which there admittedly is no design defect, but the product that clearly caused the accident has been destroyed.

In support, DCS cites several Kentucky cases in which the allegedly defective products were destroyed in the injury-causing accident or in which the court otherwise permitted the inference that the only reasonable explanation for the accident was a manufacturing defect.[5] In the court's opinion, Burner Systems effectively rebuts DCS's use of those cases. *See* Reply Mem. at 4-5 (docket no. 94). In all plaintiff's cited cases, and in more than one case in the Sixth Circuit and the Western District of Kentucky, the courts permitted inferences of defects premised

---

[5]The cases cited by DCS were *Embs v. Pepsi-Cola Bottling Co.*, 528 S.W.2d 703 (Ky. 1975)(exploding soda bottle), *Kroger Co. v. Bowman*, 411 S.W.2d 339 (Ky. 1967)(torn cardboard soda bottle carton); *Perkins v. Trailco Mfg.,* 613 S.W.2d 855 (Ky. 1981)(new trailer broken during first mile of use); *Penker Construction Co. v. Finley*, 485 S.W.2d 244 (Ky. 1972)(tilt cylinders of an end loader broke during normal use); and *Dealers Transport Co. v. Battery Distributing Co.*, 402 S.W.2d 441 (Ky. 1965)(allegedly defective plug in an acetylene gas tank).

on such circumstantial evidence *only* when the plaintiffs were able to eliminate all other reasonable explanations for the accident, thereby leaving manufacturing defect as the only reasonably possible (but unproven, from a scientific standpoint). *See* cases cited in footnote 3, *supra*; *see also Enlow v. St. Jude Medical, Inc.*, 327 F. Supp. 2d 738, 741 (W.D. Ky. 2003)(Simpson, J.).

In this case, however, DCS cannot effectively prove its entitlement to indemnity by relying on the argument that the weight of the circumstantial evidence establishes that a manufacturing defect is the only reasonable conclusion to reach when a part fails after months of normal to light use. The opinions of the identified experts in this case, including, most significantly, its own indicate otherwise. As Mr. Mulcahy admitted, there are, in fact, other possible causes of the accident that cannot be conclusively ruled out, and he could not honestly say which of the possible causes was the probable one.

DCS, however, although abjuring the phrase "*res ipsa loquitur*" has essentially asked the court to permit it to use Mr. Mulcahy's testimony as a foundation of equally un-provable possibilities from which the jury putatively can use their own common experiences to determine which of the suggested explanations for the leak is most likely the correct one under the circumstances. While the court commends DCS's counsel for their energetic advocacy, their analysis of this issue is nonetheless contrary to well-established law in Kentucky and the Sixth Circuit,[6] however.

The regulator in question was a highly technical piece of equipment, so expert testimony is required not only to explain the various possible explanations for its failure, including

---

[6]Applying Kentucky law.

manufacturing defect, but also to opine about the *probable* cause of the accident. *See, e.g., Gray v. General Motors Corp.*, 312 F.3d 240, 242 (6th Cir. 2002))(requiring expert testimony regarding alleged defects in a seatbelt mechanism, and noting "Gray's shortcoming in this litigation is simply a failure to offer the proof necessary to establish the claims asserted ... the plaintiff's expert was unable to identify any "probable" defect in the seatbelt mechanism that caused the injury, as is required by Kentucky products liability law")*; see also Thomas v. Manchester Tank & Equip. Corp.,* 2007 WL 3673118, *3 (W.D. Ky. 2005)(Heyburn, J.)(requiring expert testimony in support of a product liability claim involving a heat regulator). "The proof in this case establishes no more than possibilities or combinations of possibilities," with no expert able to pierce the "veil of speculation" that Burner Systems's regulator was defectively manufactured. *Texas v. Standard,* 536 S.W.2d 136, 138 (Ky. 1976)(internal citation omitted). As such, DCS has failed to meet its burden of establishing its entitlement to indemnity.

**III.**

This case is in an unusual procedural posture. Often, when the manufacturer of a component part of an allegedly defective product is identified and sued as a third-party defendant, the plaintiff and any intervening plaintiffs amend their complaints to include a direct cause of action against the component part manufacturer. Here, however, Burner Systems is only a party to this action because of a defendant's equitable claim for indemnity, and indemnity claims customarily are evaluated and resolved after a determination of fault has been made. There has been no determination of DCS's liability yet, much less any determination of whether it is *in pari delicto* with Burner Systems.

Burner Systems's motion thus might be considered premature, *cf. Budd*, 199 F.3d 799,

807 (6th Cir. 1999)(citing *Clark v. Hauck Mfg. Co.,* 910 S.W.2d 247, 253 (Ky. 1995)("Indemnity is not an issue until fault has been determined....")), and the court has considered whether it is appropriate to make certain factual determinations necessary to the resolution of Burner Systems's equitable claim that would ordinarily be squarely within the province of the jury. Better perhaps to "let the jury sort it out" and determine whether they believe that the leak probably caused by a manufacturing defect of DCS, or Burner Systems, or perhaps not by a manufacturing defect at all (*e.g.,* an improper installation or placement of the propane tanks and gas lines leading to the range), before making an equitable determination.

After lengthy and careful consideration, however, the court is firmly of the opinion that postponing evaluation of DCS's indemnity claim until after there has been a possible finding of liability by the jury would be unwarranted under the law and under principles of federal civil procedure requiring that cases be determined in a way that is "just, speedy, and inexpensive." Fed. R. Civ. P. 1. Discovery is closed. The parties' evidentiary cards are face up on the table, and they establish that DCS simply cannot meet its burden of proving that Burner Systems's fault is greater than its own. Delay would therefore lead to an unnecessary expenditure of significant resources by the litigants and the court and, possibly create the inappropriate risk of confusing the jury. Accordingly, for the reasons stated above, the court will enter an order concurrently with this opinion that grants Burner Systems's motion for summary judgment and dismisses with prejudice DCS's claim for indemnity.

DATE: July 26, 2010

*James D. Moyer*
**James D. Moyer**
**United States Magistrate Judge**

cc: counsel of record