# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### AT LOUISVILLE

NANCY SIEGEL                                                    PLAINTIFF

V.                                                        NO. 3:08CV-00429-S

KENTUCKY FARM BUREAU
MUTUAL INSURANCE COMPANY                        INTERVENOR PLAINTIFF

V.

DYNAMIC COOKING SYSTEMS, INC.                            DEFENDANT

## <u>MEMORANDUM OPINION</u>

At the close of plaintiff's proof[1] on the third day of the jury trial of this matter, Dynamic

Cooking Systems, Inc. ("DCS") moved for judgment as a matter of law pursuant to Federal Rule

of Civil Procedure 50.  For the reasons stated below, the court granted the motion.

## I.

The court has had several opportunities to recite the background of this litigation in prior

opinions, but because directed verdicts are not frequently granted, and because the court is

mindful that a directed verdict ruling is so significant a ruling to those involved, a moderate

amount of repetition is warranted to explain adequately how the court arrived at its decision.

The plaintiff, Nancy Siegel, was injured while she was using a propane gas range

manufactured by Dynamic Cooking Systems.  The range was manufactured in January 2005, but

not purchased by Ms. Siegel until July 2008.  Although the range was over three years old, she

---

[1]For the jury's convenience, the parties agreed to present and argue the motion at the start of the day, before
Ms. Siegel (the last witness for her side) testified and, accordingly, stipulated that certain facts presented in prior
pleadings would be accepted for the purposes of the motion as if they were Ms. Siegel's testimony.

purchased the range "new" and had only owned it for approximately one year, during which time she used it relatively infrequently (once a week, on average).

At the time of the accident, Ms. Siegel was heating a can of corn on one of the range's burners, when she heard an unusual noise and opened the oven door to determine the noise's origin. When Ms. Siegel opened the range's oven door, fire escaped and burned the exposed areas of her skin – chiefly her hands and feet, but also some of her face as well. She suffered painful first and second degree burns that left her bedridden and took months to heal. Although no scarring is evident on her face, there is some hypo-pigmentation and some hyper-pigmentation of the other areas that were burned. She also continues to experience pain and swelling in her feet when she is required to stand for more than a moderate amount of time.

After her injuries healed, Ms. Siegel sued DCS and its affiliated New Zealand holding company, Fisher & Paykel Appliances Holdings Ltd., asserting claims of strict product liability, negligence, and breach of warranty, and requesting punitive damages. Because there never existed any evidence that Fisher & Paykel was directly involved in the management of DCS, or in the manufacture of its ranges, however, the court granted Fisher & Paykel's unopposed request for summary judgment of the claims against it shortly before the trial.

The home in which Ms. Siegel was living at the time of her accident belonged to her boyfriend, and was insured by him. Consequently, his insurance company, Kentucky Farm Bureau, promptly investigated the accident and, approximately one year after the litigation commenced, filed an intervening complaint in this case, in which it also asserted claims of strict product liability, negligence, and breach of warranty.

After the parties' investigation and preliminary discovery indicated the range's regulator was the source of the leak that caused the fire, and that the regulator was manufactured not by

DCS, but by another company, Burner Systems International, Inc., DCS asserted a third-party claim for common-law indemnity against Burner Systems. For reasons unknown to the court, however, Ms. Siegel, did not subsequently seek to amend her pleadings to assert claims directly against Burner Systems. Nor did Kentucky Farm Bureau's Kentucky Farm Bureau raise the issue of a direct claim against Burner Systems in its intervening complaint, even though its intervening complaint was filed after DCS filed its third-party complaint against Burner Systems. Instead, the case proceeded (in pertinent part) as follows:

| DOCKET NO. | PLEADING | |
|---|---|---|
| 1 | **Complaint** | |
| 36 | **DCS's Third Party Complaint** against Burner Systems | |
| 53 | Kentucky Farm Bureau's **Intervenor Complaint** | |
| 83 | **Burner Systems' Motion for Summary Judgment** of DCS's Claim for Indemnity | **GRANTED** (dkt. 103) |
| 100/111 | **Ms. Siegel's and Kentucky Farm Bureau's Trial Briefs** (containing no mention of, and thus implicitly abandoning, her breach of warranty claim) | |
| 101/102/112 | **Ms. Siegel's and Kentucky Farm Bureau's Proposed Jury Instructions** (including no proposed instruction for breach of warranty) | |
| 121/122/124 | DCS's **Motions to Exclude** the other parties' retained experts' testimony | |
| 148/149 | Opinion and Order **Granting Motions to Exclude Thomas Crane from Testifying as an Expert Witness at Trial** (dkt. 122) and to **Prohibit the Use of Deposition of Thomas Crane at Trial** (dkt. 121) | |
| 153/154 | Opinion and Order **Granting in Part DCS's Motion to Exclude Ms. Hewlett & Mr. Riggs** (of Donan Engineering) **from Testifying as Experts** (dkt. 124) | |
| 159 | DCS's and Fisher & Paykel's **Joint Motion for** | |

| | | |
|---|---|---|
| | **Summary Judgment** (filed past the deadline by permission) | |
| 164/165 | Opinion and Order **Denying DCS's Motion for Summary Judgment and Granting Fisher & Paykel's** | |
| <div align="center">**JURY TRIAL BEGAN MONDAY, NOVEMBER 8, 2010**</div> | | |
| 119 | DCS's **Motion to Exclude Evidence of Other Incidents, Claims & Lawsuits** | Granted, due to lack of evidence that proffered other incidents are "substantially similar" to the accident at issue. |
| 120 | DCS's **Motion to Exclude Evidence Regarding Cost of Alternative Regulators** | Ruling withheld, pending evidence presented at trial. |
| 123 | DCS's **Motion to Exclude Evidence Regarding Later Model Ranges** | Ruling withheld, pending evidence presented at trial. |
| Ms. Siegel's **Request to Introduce Photographs of Her Injuries During Opening Statements and as Evidence During Trial** | | Granted, in part. Ms. Siegel was permitted to offer a representative photograph of each injured area. |
| Ms. Siegel's **Request for Reconsideration of DCS's Motion to Exclude Evidence of Other Incidents, Claims & Lawsuits** in light of DCS's failure to produce a detailed list of warranty claims until the weekend before trial. | | Denied. |
| Ms. Siegel's **Request for the Court to Reconsider its Prior Ruling and Permit Her to Offer Certain of Mr. Crane's Deposition Testimony as Evidence** | | Initially denied, but later granted in part, because of the late produced list of warranty claims indicating complaint-worthy heat in the kickplate in front of |

| | the regulator. Plaintiff permitted to introduce Mr. Crane's deposition testimony regarding temperature data from his test range, and his opinion regarding whether the range met ANSI standards. |
|---|---|
| Nov. 9 | Ms. Hewlett (fire investigator) Testified |
| Nov. 9 | Mr. Riggs (engineer) Testified |
| Nov. 9 | Ms. Collins (Ms. Siegel's niece) Testified |
| Nov. 9 | Dr. Derr (a plastic surgeon) Testified by Video Deposition |
| Nov. 9 | Portions of the deposition testimony of Thomas Crane (Burner Systems' expert) were read into the record. |
| Nov. 10 | DCS's **Motion for Directed Verdict** (For the jury's convenience, the motion was argued before Ms. Siegel testified. Counsel stipulated that Ms. Siegel would be the final witness for the plaintiff's side and that the facts pertaining to Ms. Siegel's deposition testimony that were recited in her opposition to DCS's prior motion for summary judgment would be accepted as true for the purpose of the directed verdict motion.) |

## II.

The court described the progress of the case above to highlight several atypical aspects of this litigation that, to varying degrees, complicated what might have been a relatively standard product liability case and led to the court's ultimate decision to grant DCS's mid-trial request for judgment as a matter of law on all claims. The court will discuss each more fully below, but generally speaking, certain tactical decisions by plaintiff, which would likely have been without

-5-

great significance in isolation, cumulatively impaired plaintiff's ability to practice her case because their effects were exacerbated by the effects of other, at first seemingly unrelated, tactical decisions by the other parties.

*The Pre-Trial Elimination of Burner Systems as a Party*

None of the parties disputed that Ms. Siegel had been hurt by the accident, and all parties' experts agreed that the accident was caused by a leak in the regulator that was manufactured by Burner Systems and included as a component part in the range manufactured and sold by DCS. Consequently, the case at first appeared to fit adequately within the customary product liability scenario that requires a person injured by a product to bring the manufacturer of the product and, if applicable, the manufacturer of any component parts, before the court and let the jury determine the degree to which each is responsible for any damages.[2] In this case, however, there were two competing potential sources of evidentiary support for Ms. Siegel's product liability claim: an allegedly defective design of the range by DCS and the allegedly defective manufacture of the regulator, one of its component parts, by Burner Systems. Because the company that placed into the stream of commerce a product that may have been defectively designed (DCS) and the company that manufactured that component part that may have been defectively manufactured (Burner Systems) were not co-defendants, that changed the legal landscape of the customary product liability claim scenario. Alert to this unusual happenstance, Burner Systems rightfully took advantage of it. In so doing, this alignment of parties added the first layer of difficulty to Ms. Siegel's path to recovery.

_____

[2]Assuming, of course, that the other burdens of proof (*e.g.*, *without limitation*, causation) are established.

As the court noted above, the only claim ever made directly against Burner Systems was DCS's indemnity claim. Because that claim carried with it different legal issues than plaintiff's direct claims against DCS, and required a different measure of proof, Burner Systems moved for summary judgment. After much deliberation, the court granted that motion. *See* docket no. 103.

The court's decision to rule pre-trial on indemnity was out of the ordinary, because indemnity claims generally are not adjudicated before the conclusion of a trial. This is so because in Kentucky, common-law indemnity is an equitable remedy awarded by the court, as a matter of law, and is only "available to one exposed to liability because of the wrongful act of another with whom he/she is not *in pari delicto*." *Degener v. Hall Contracting Corp.*, 27 S.W.3d 775, 780 (Ky. 2000). Accordingly, a claimant's entitlement to indemnity is usually a post-trial issue taken up only if plaintiff is successful. Thus, the pre-trial adjudication of DCS's indemnity claim, while warranted, was an unusual procedural event.

To prevail on its indemnity claim arising from plaintiff's claims, DCS was required to establish that it was probable that the greater fault for the accident lay with Burner Systems, as opposed to DCS. All of the retained experts (regardless of party affiliation) agreed that there was no design defect in the Burner Systems regulator, however. And, there was no serious contention that DCS's manufacture of the range was defective, as the evidence in the record indicated that the regulator arrived at DCS as a sealed unit that required little more than insertion into the range as part of DCS's manufacturing process. Accordingly, DCS was required to establish that it was probable (as opposed to merely possible) that a defect in the design or manufacture of the regulator caused it to leak, as opposed to a defect in the design or manufacture of the range itself that may have degraded a non-defective regulator. The jury

could not be asked under Kentucky law to speculate which of several competing possibilities was, in fact, the actual cause of the leak. (DCS would have remained potentially liable *to the plaintiff* for placing the range with the defective regulator in the stream of commerce, but then could have made a viable argument that it would not have been exposed to liability but for Burner Systems' wrongdoing.)

Had the regulator not been largely destroyed in the accident, DCS's task might have been easier. The regulator was largely destroyed, however, and thus none of the experts (who were all forthright about this point) could definitively state that the cause of the accident was a manufacturing defect with respect to the regulator, because they could not point to the actual, specific part that failed and show why it failed. They could have, in theory, established that a manufacturing defect as a conclusion of exclusion, but one of the experts (Burner Systems' expert, Thomas Crane) suggested that even a properly manufactured regulator might have failed if it were exposed to temperatures in excess of its specifications, and suggested that the regulator in Ms. Siegel's range might have been so exposed, because of the way in which her model range was designed with respect to the placement of the regulator. Although they did not all wholeheartedly agree with Mr. Crane's analysis, none of the experts, including DCS's, definitively debunked his theory. (Kentucky Farm Bureau's expert, while not giving it his full-throated support, opined that if data on which it was premised were accurate, then it would not be inconsistent with his own observations. DCS's expert honestly acknowledged that there were several possible causes of the leak that could not be conclusively ruled out because the regulator was destroyed.) This muddied the waters considerably, as there was thus no expert whose report

or testimony definitively removed the possibility suggested by Mr. Crane that DCS's design of the range could have caused the regulator to degrade and eventually leak.

After reviewing the record, including all pleadings filed (none of which included a motion by DCS to exclude the testimony of Mr. Crane pursuant to Fed. R. Evid. 702 or *Daubert,* but more about that later), the court concluded that, although a pretrial adjudication of an indemnity claim was not typical practice, it was warranted under the circumstances, as the available evidence established no more than possibilities or combinations of possibilities, with no expert able to pierce the "veil of speculation" that Burner Systems's regulator was defectively manufactured.  Asking the jury to speculate about which theory was correct would have been improper.  (*See* docket no. 103).  DCS's claim against Burner Systems was thus dismissed, leaving DCS as the sole defendant, and plaintiff's remaining routes to potential recovery as follows:

> (1)  the regulator leaked because the range was defectively designed, for which DCS would be entirely to blame and also legally liable under the theories of either negligence or strict product liability;
>
> (2)  the regulator leaked because it was defectively manufactured, for which Burner Systems' would be entirely to blame, but DCS would be nonetheless legally liable to plaintiff because DCS placed a defective product in the stream of commerce;
>
> (3)  breach of warranty.

*DCS's Motions to Exclude the Trial and Deposition Testimony*
*of Burner Systems' Expert, Thomas Crane*

After some reflection about the effect of the dismissal of Burner Systems, DCS made a strategic decision that, most certainly by virtue of its timing and possibly by plaintiff's decision

not to retain her own experts, added yet another layer of complexity to what had already become an unusually complex posture of the case.

Burner Systems' retained expert was Thomas Crane, a Minnesota resident not subject to the subpoena power of this court who was unwilling to appear voluntarily at trial as a witness for Ms. Siegel. Consequently, Mr. Crane ordinarily would have been out of the evidentiary picture once Burner Systems was dismissed from the case. When Ms. Siegel indicated that she wished to adopt his opinions and introduce his report and deposition testimony at trial, however, DCS responded. DCS moved, pursuant to Federal Rule of Civil Procedure 702, and citing *Daubert* and its progeny, to exclude Mr. Crane's testimony and report from being introduced in evidence. (It had not made this motion earlier when opposing the Burner System indemnity motion.)

After careful considering the applicable law and conducting a detailed review of Mr. Crane's report and deposition testimony, the court granted DCS's motion to exclude Mr. Crane from testifying as an expert. (*See* docket no. 148.) The court determined that Mr. Crane's opinions, as careful and circumscribed as he tried to make them, were nonetheless the result of too much speculation, because, *inter alia*, they were founded exclusively on data gathered from the testing and evaluation of only one other range of the same model number.

As the court observed:

> [Mr. Crane] first speculated that the exemplar range was an adequate exemplar, in spite of the differences in how it was fueled, and how frequently it was used as compared to Ms. Siegel's range. From information gleaned during the testing of the exemplar range, but without adequately ruling out the historical differences in use between the exemplar range and Ms. Siegel's range, or analyzing what differences might be attributable to the use of two different types of fuels used, he then speculated what might have caused the leak in the regulator. He did not, however, attempt to replicate the data that formed the basis for his speculation by testing and

-10-

examining other exemplar ranges. Nor did he gather historical data regarding other Burner Systems regulators that leaked to test his theories. Rather, he tested a redesigned model and made further assumptions based on the differences in design, but without testing the regulator in the redesigned model for signs of heat degradation at withing-range operating conditions.

Mr. Crane nowhere addressed in his report the undisputed fact that the diaphragm in the regulator of the exemplar range, used for five years on an almost daily basis, never failed. He inferred that the diaphragm in the regulator of Ms. Siegel's range failed when with used with propane, as opposed to natural gas, much less frequently and during an markedly shorter overall time period, but nowhere explained why it would fail under those circumstances, not under heavier usage with natural gas.

Mem. Op. at 5-6 (docket no. 148). Consequently, the court concluded that Mr. Crane must be precluded from testifying as an expert because:

[c]onclusions, based on accurate data, may rest on a modicum of reasonable, reliable, speculation, that is informed by the rigorous application of the scientific method, particularly where, as here, the product being evaluated has been destroyed by its failure. But Mr. Crane's opinion ... contains not just one speculation, but a string of them, whose numerosity will not permit the string to hold. He merely has a seemingly plausible hypothesis, but he has not tested it in a way that is admissible under the Federal Rules of Evidence.

Mem. Op. at 6 (docket no. 148)(internal citations omitted).

In reaching its conclusion, the court was fully aware of the irony that its evaluation of the viability of DCS's indemnity claim would have been quite different had Mr. Crane's testimony been excluded earlier in the litigation, because Mr. Crane was the originator of the theory that DCS's range may have been defectively designed. It was this range defect theory – coupled with the other experts' candid acknowledgement that, if Mr. Crane's observations and data were correct and applicable generally with respect to the particular model range at issue, the theory could not be eliminated as a possible explanation for the cause of Ms. Siegel's accident –

that made Burner Systems's motion for summary judgment successful on DCS's indemnity claim.

No expert or lay witness suggested pre-trial that defective manufacture of the range was a supportable theory. Consequently, had Mr. Crane's testimony been excluded prior to the court's consideration of Burner Systems' motion, there would have been no theory that potentially exculpated Burner Systems. Without that theory, there was no risk that a jury would have been asked to engage in impermissible speculation about which company's actions caused the regulator to fail. It was thus unexpected that DCS elected not to attempt to exclude his testimony until later in the case. Their timing notwithstanding, DCS's motion was granted.

This appeared to leave plaintiff with two remaining potential paths to recovery:[3] strict product liability, because DCS was liable for placing a range containing a defectively manufactured regulator in the stream of commerce, and breach of warranty. The first route might have permitted a punitive damages instruction, because it was a tort claim. The second, a contract claim, would not.

*Claims Abandoned at Trial*

Although Ms. Siegel and Kentucky Farm Bureau initially made claims for breach of warranty, Ms. Siegel proffered no evidence or testimony, made no argument, and tendered no jury instruction regarding any express or implied warranty with respect to her range. Parties are, of course, free to abandon claims as they wish, and often do, when another claim appears just as

---

[3]As noted above, all the experts agreed that the regulator was not defectively designed. There was no evidence or likely to be any testimony that the range was defectively manufactured. And, with Mr. Crane's testimony excluded, there was unlikely to be any expert testimony to support a conclusion that peculiarities of the range's design caused the regulator to leak, thereby effectively precluding a design based claim against DCS for either negligence or strict product liability.

strong and permits an equal or greater amount of potential recovery, but in this case the choice to forego a claim that might not have permitted as much damages (for example, it would not have supported a punitive damages request), but was a seemingly viable alternative route to recovery, was puzzling.

The decision was puzzling because it initially appeared to the court that Ms. Siegel chose to forego the breach of warranty claim in favor of the others that would permit a punitive damages instruction. Yet at trial she offered no evidence to support such an instruction for punitives. She did not introduce testimony from any DCS employee to establish that the company was aware that the range was defective, that it profited from not disclosing or remedying any defect, that it concealed evidence or knowledge of a potential defect, or any other evidence that would establish that DCS's conduct in the manufacture and sale of the range evinced an indifference to or reckless disregard for the health and safety of others. When questioned about this by the court during the oral argument of DCS's motion for directed verdict, counsel stated he had no response, thereby conceding that the evidence did not support a request for punitive damages.

In addition, plaintiff never independently retained any expert of her own. During her presentation of the case, she relied on Kentucky Farm Bureau's designated engineering experts, and had paid a small portion of their fees.[4] She did not hire an expert to opine about the damage to her person, choosing instead to rely on the deposition testimony of Dr. John Derr, Jr., a plastic surgeon, who examined Ms. Siegel, but appears to have been retained by another party.[5] And,

---

[4]Docket no. 78-2.

[5]Docket no. 78-1.

she did not hire an expert to opine about the degree to which her injuries may have permanently impaired her ability to labor and earn wages.

Litigation is expensive – very expensive – and Ms. Siegel undoubtedly has limitations on her resources.  The court therefore will not say it was unreasonable for her to choose to rely on the expert testimony of another party whose interests were aligned so closely with her own. Unfortunately, however, this choice ultimately worked to her detriment, because, by the conclusion of her case in chief, Ms. Siegel had no expert testimony that would have supported her claim that her ability to work was permanently impaired by the accident, and may have had other gaps in the proof necessary to establish her damages.[6]  Plus, she had implicitly abandoned her breach of warranty claim and her claim for punitive damages.  Under more typical circumstances, she would have been left with two seemingly quite viable, triable bases for recovery: strict product liability and negligence.

Yet, there was no meaningful evidence that would support a claim of negligent manufacture of the range.  What little evidence existed established only that the regulator arrived at DCS as a sealed unit that needed only to be attached to the range; that attaching the regulator was a rather simple procedure not involving the part of the regulator that leaked; and that there was nothing to suggest that the regulator was damaged in a way that would cause it to leak during the manufacturing process at DCS.  Nor was there any evidence that DCS was, or should have been, aware of a pre-existing problem with the regulator when they sold the Ms. Siegel's

---

[6]For example, Ms. Siegel did not introduce any evidence of the amount of any lost wages or other income during her recovery at her niece's house, or of her medical expenses, if the court accepts only the narrow facts stipulated by the parties, because there was no mention of lost wages or income, or of the amount of her medical bills, in Ms. Siegel's response to DCS's motion for summary judgment.  For the sake of argument, however, as the remainder of this opinion will render the sufficiency of the damages proof a moot issue, the court will assume that Ms. Siegel would have testified and offered documentary evidence of her lost wages and medical bills.

range.  There was no evidence that their quality control systems were inadequate or not observed.  There thus appeared to be nothing for the jury to consider with respect to any claim against DCS for negligent manufacture.

<div align="center">*Ms. Siegel's Remaining Tort Claims*</div>

Perhaps Ms. Siegel was mindful of the fact that no expert could honestly and definitively say whether, and if so how, Burner Systems' regulator was defectively manufactured because it was destroyed in the accident.  Accordingly, perhaps she was also concerned about this court's previous observations regarding its understanding of the extremely limited circumstances in which circumstantial evidence alone could be used in furtherance of a product liability claim involving a complex piece of equipment, which the court made first in its opinion regarding Burner Systems' motion for summary judgment and recently in its decision to deny DCS's motion for summary judgment.  Perhaps she placed reliance on a small portion of the latter opinion, in which the court stated:

> To withstand DCS's request for summary judgment of her claims, the plaintiff is not required to establish precisely *why* the range failed, but *whether* it did.[7]

Mem. Op. at 5 (docket no. 164).  The court does not know.

What the court does know, is that withstanding a motion for summary judgment is different than making one's case at trial.  *Compare Kentucky Farm Bureau Mut. Ins. Co. v. Hitachi*, 2009 WL 2760956 (E.D. Ky. 2009)(Reeves, J.) and *Gray v. Gen'l Motors Corp.*, 133 F. Supp. 2d 530 (E.D. Ky. 2001).  When evaluating a request for summary judgment, the court may

---

[7]Citing *Kentucky Farm Bureau Mut. Ins. Co. v. Hitachi Home Electronics (America), Inc.*, 2009 WL 2760956 (E.D. Ky. 2009)(Reeves, J.), this is the argument upon which Ms. Siegel chiefly relied in opposing DCS's Rule 50 motion.  *Hitachi* is an opinion regarding a summary judgment motion in a product liability action based on circumstantial evidence that a television, as opposed to nearby cords and wires, caused the fire at issue.

consider all available, potentially admissible evidence in the record. In considering a defendant's motion for directed verdict, however, it is limited to the evidence and testimony introduced or stipulated to during the plaintiff's case in chief,[8] which is why the court observed in its most recent opinion:

> ... the court's exclusion of Mr. Crane's testimony under Fed. R. Evid. 702 does not mean that DCS's potential liability under either of her claimed theories (*i.e.,* strict product liability and negligence) is not triable. Plaintiff has a small evidentiary needle to thread, but she has the right to attempt it nonetheless.
>
> Whether plaintiff will, at trial, be able to piece together sufficient testimony and evidence from the remaining expert or lay witnesses to convince a jury that she is entitled to recover from DCS under a theory of either design or manufacturing defect remains to be seen, but there appears to be enough that the jury potentially could consider, *if it were ... elicited during the examinations of the remaining witnesses.*

Mem. Op. at 5-6 (docket no. 164)(emphasis added). Plaintiff elected to try to thread the small evidentiary needle and keep open as many tort claims as possible, including claims for both strict liability and negligence with respect to DCS's design of the range. In so doing, however, she inadvertently backed into the same difficulty that DCS had when it tried to withstand Burner Systems' motion for summary judgment: she introduced evidence that could have been left out, but once introduced would have required the jury to speculate as to which of two suggested problems -- range design or regulator manufacture -- actually caused the regulator to fail.

---

[8] Fed. R. Civ. P. 50(a). Also, in a diversity action such as this one, a federal court must apply the law of the forum state when considering a motion for judgment as a matter of law. *Clark v. Chrysler Corp.*, 310 F.3d 461, 476 (6th Cir.2002) *reinstated by* 436 F.3d 594, 598 n. 5 (6th Cir.2006). "Under Kentucky law, a motion for judgment as a matter of law should be granted ... if no disputed issue of fact exists upon which reasonable minds could differ." Id., at 476 (internal quotations omitted). The court must accord the non-moving party with "every favorable inference which may reasonably be drawn from the evidence ...." *Morales v. American Honda Motor Co.*, 151 F.3d 500, 506 (6th Cir.1998); *Engebretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721, 726 (6th Cir.1994).

Before the jury was empaneled, the court listened to the arguments of counsel regarding pending motions in limine and last minute requests for evidentiary rulings. Among those were plaintiff's requests that the court permit her to use certain photographs during her opening statement, her request that the court reconsider its decision to preclude evidence of other claims and incidents, and her request that the court permit her to introduce certain testimony of Thomas Crane.

One of the photographs shown to the court during oral argument of these requests was a picture of Ms. Siegel's range, which showed that the regulator was placed in the bottom, right, front of the range, just behind the kickplate. This placement many have been well known to counsel, but had escaped the attention of the court, until plaintiff complained that she had not been provided with a list of warranty claims and customer complaints until the weekend before trial. Several of those claims included complaints that the kickplate in other ranges of the same model as Ms. Siegel's was noticeably hot, or "extremely hot" to the touch. Although the court did not reverse its decision to exclude those other customer complaints from evidence, it did, at plaintiff's request, permit the introduction of limited portions of Mr. Crane's deposition testimony into evidence, specifically those portions that pertained to the temperature measurements the obtained from his exemplar range, and his knowledge of ANSI standards.

*Ms. Siegel's Liability Case in Chief*

Plaintiff began by presenting evidence to support her theory that the regulator was defectively manufactured. Her first witnesses were Ms. Miranda Hewlett and Mr. David Riggs of Donan Engineering. Ms. Hewlett concluded, based in part on an examination by Lyons Gas Company, that there was no leakage or malfunction in the propane gas delivery system. She

therefore concluded that it was possible to eliminate factors "upstream" of the range as possible causes of the fire and explosion.

Mr. Riggs then conducted flow tests with soapy water, which corroborated the conclusion of Ms. Hewitt that the leakage which had caused the incident was from the regulator in the range. Mr. Riggs also eliminated tampering, alteration, or physical damage to the range by visual examination. Having eliminated problems with the propane system, and having determined that the leakage was from a regulator in an unaltered stove, he declared that there was a "manufacturer's defect," referring to the regulator. During his testimony, he was ultimately no more specific than that. The regulator had been destroyed, and he admitted that he therefore could not specify the particulars of the defect (*e.g.*, a specific method of faulty assembly, or the use of improper or degraded materials).

Plaintiff next read portions of Mr. Crane's testimony into the record. That testimony brought three things to the jury for consideration: (1) on the one other range he selected as a satisfactory exemplar for comparative testing, Mr. Crane performed temperature measurements that indicated that temperatures in the vicinity of the regulator of the exemplar range could reach as high as 259 degrees, (2) the Burner Systems' regulator that was included in Ms. Siegel's range is rated only to 225 degrees, and (3) exposing a regulator to temperatures in excess of its ratings does not comport with with a particular American National Standards Institute (ANSI) standard.

Before the trial started, and outside the presence of the jury, Ms. Siegel's counsel alluded to the fact that DCS is the only manufacturer who places its regulator in the bottom, right front of the range, but she presented no testimony in support of that statement, or that other manufacturers opt for a different design to prevent exposing their regulators to excessive heat.

In addition, Mr. Crane measured temperatures in only one exemplar range, though, and Ms. Siegel had retained no expert of her own to determine whether his results could be replicated in other ranges of the same model. Moreover, she presented no testimony from a DCS representative that it failed to consider either the applicable ANSI standard, the potential effect of high temperatures on the regulator selected, or whether a different model regulator might be better suited to the temperature conditions inherent to the range's design. Ms. Siegel thus did not introduce enough evidence to establish that DCS failed to exercise ordinary care in its design of the range, or that the regulator placement or selection actually caused the failure. The temperature measurements were the start of a theory, but by themselves they were certainly insufficient.

Thus, at the close of her proof, plaintiff had offered evidence putatively in support of two different but inconsistent theories of product liability against DCS: first, that there was a manufacturing defect of some unknown variety in the range's regulator; and second, that there was a design defect in the range itself with respect to the regulator placement or temperature specification.

It was at this point that all the various complicating factors converged, creating a difficult situation for Ms. Siegel. Burner Systems was out of the litigation. Plaintiff had abandoned her breach of warranty claim and request for punitive damages against DCS. There was no evidence that the regulator was defectively designed, or that the range was defectively manufactured. There was no evidence that DCS negligently manufactured the range, and only some inconclusive, insufficient, evidence from Mr. Crane's testimony to establish that DCS negligently designed the range. Could the court permit the plaintiff to ask the jury to evaluate

her remaining claim of product liability based on both circumstantial evidence of a manufacturing defect with respect to the regulator (because there existed no proof of the precise mechanism of failure), *and* a design defect with respect to the range?

The court concludes that the answer is no. While Kentucky law will permit a plaintiff to submit a case to a jury based on an unidentified manufacturing defect, one requirement for such a theory is that the plaintiff have eliminated all other reasonable theories of liability. *See, e.g., Gray*, 133 F. Supp. 2d at 533-34 (*citing Midwestern V.W. Corp. v. Ringley*, 503 S.W.2d 745 (Ky. 1973) and *Briner v. Gen'l Motors Corp.*, 461 S.W.2d 99 (Ky. 1970)). By energetically embracing a separate and inconsistent design defect theory, she prevented herself from meeting that requirement. *Id.*;[9] *see also Briner v. General Motors Corp.*, 461 S.W.2d 99 (Ky. 1970)(determining that evidence supporting competing theories failed to tilt the balance from possibility to probability and, accordingly, should not have been sent to the jury).

By introducing testimony from Crane, Ms. Siegel attempted to tell the jury that the regulator failed because the range was too hot and the regulator selected was not designed to withstand excessive heat. In so doing, she eliminated her ability to assert that, although no one could identify *why* the regulator failed, the only reasonable conclusion was a regulator manufacturing defect, a claim that requires that all other reasonable possibilities have been

---

[9]In *Gray*, in which judgment was entered pursuant to Rule 50, the plaintiff advocated only a design defect. In that litigation, plaintiff asserted that the restraint system in his vehicle was defectively designed because it permitted him to be partially ejected during an accident. The court held that plaintiff failed to meet his burden of proof, because there existed no expert testimony that could identify and isolate a particular design defect that may have caused his restraint system to fail. *Gray*, 133 F. Supp. 2d at 533-34. Because several possible design defects were theorized, but none isolated, the court held that Mr. Gray failed to "tilt the balance from possibility to probability" and would therefore have required the jury to engage speculation, which is not permitted under Kentucky law. *Id.* at 534.

-20-

eliminated using circumstantial evidence. But all other possibilities had not been eliminated. Ms. Siegel had energetically advocated another one – range design defect.

The circumstantial evidence approach is permissible under Kentucky law when a product has been destroyed in the accident, if the plaintiff can eliminate the need for the jury to speculate whether the product was or was not defective by eliminating other reasonable, possible causes for the product's failure through appropriate lay and expert testimony. *See Perkins v. Trailco Mf'g and Sales Co.,* 613 S.W.2d 855, 857-58 (1981)*; compare Kentucky Farm Bureau Mut. Ins. Co. v. Hitachi Home Electronics (America), Inc.*, 2009 WL 2760956 (E.D. Ky. 2009)(Reeves, J.)(evaluating a summary judgment motion, as opposed to a Rule 50 motion, and determining that there existed enough in the record to support the inference that a defect in a television was the probable, as opposed to merely possible, cause of the accident, even though no expert could identify the specific defect).[10] But an allegation of an unspecified manufacturing defect of one of a product's component parts that cannot be determined by anything other than circumstantial evidence, and an allegation of a design defect of the entire range, are two theories that do not coexist or overlap. They are inherently inconsistent. By proceeding on these two different and inconsistent theories, plaintiff eliminated her ability to present a purely circumstantial case.

### III.

A plaintiff receives painful burns from the malfunction of a relatively new, infrequently used, gas range. She recovers nothing. How can such a result occur under our civil justice

---

[10]In *Hitachi* there was no inherent conflict between the manufacturer of the television and the manufacturer of one of its component parts, and the plaintiff's expert was forthright in his testimony that he could identify neither a design, nor a manufacturing defect. Had the plaintiff proceeded to trial and presented evidence of both types of defect, perhaps the ruling would have been different, but at the summary judgment stage, there arguably was enough in the record to permit the plaintiff to present at least a circumstantial evidence case with respect to an alleged manufacturing defect, and perhaps the implicit assumption that the plaintiff would streamline its claims at trial.

system?  The answer is that a plaintiff proceeding solely in tort cannot recover simply upon a showing of malfunction.

Under contract law, in certain circumstances a seller can be liable for damages simply if the product fails to meet its ordinary purposes. No negligence or product defect need be proven. To recover in tort, however, a plaintiff must prove not only that the product malfunctioned, but also that it malfunctioned because a defect existed, or because the defendant was negligent.  This is not always an easy task.

In this matter, Ms. Siegel had a choice.  Having abandoned her breach of warranty claim, she could have attempted to prove there existed a specific, identifiable defect in the range or one of its component parts, in which case she would have to survive the rigors of Federal Rule of Evidence 702 and *Daubert*.  Alternatively, she could have proceeded without offering expert proof of a specific defect, asking the jury instead to determine that a defect nonetheless must have existed based solely on circumstantial evidence and the exclusion of other causes.  She elected to make no choice and thus her proof at trial might be summarized this way:

> Members of the jury, we know what caused the accident which injured Ms. Siegel.  The regulator in the range leaked.  Even though the regulator was destroyed, we know there must have been a manufacturing defect in the regulator, because we have eliminated all other possible explanations for why it leaked.  However, if you don't believe that, you should conclude that the regulator leaked because DCS improperly designed the range in such a way that the regulator was subjected to excessive temperatures that it could not withstand.

Having chosen to try to establish a specific design defect, Ms. Siegel negated one of the elements Kentucky law requires in a manufacturing defect case based on circumstantial evidence alone. She could not rule out another possible reason why the regulator leaked.

To allow plaintiff to proceed on a "heads I win, tails you lose" trial strategy would have thereby turned the circumstantial manufacturing defect approach into a backstop, a catch-all product liability theory, to be used in the event that more specific theories fall short. This is not the purpose for the circumstantial evidence exception to the general requirement of proof of a specific defect.

## IV. CONCLUSION

Judge Thomas Ballantine of this court was justly respected for his succinct opinions. This long one does not meet his standard of brevity, but the court has concluded that the unusual procedural context and the order of rulings on liability and expert testimony deserve a full explanation.

The accident with Ms. Siegel was both unfortunate and unique. To the knowledge of the court, no other DCS range of similar design has failed in the way in which Ms. Siegel experienced. The Siegel range was examined by two experts from Farm Bureau, an expert from the range manufacturer, and an expert from the regulator manufacturer. This litigation went on for a prolonged period and over time different hypotheses of failure were advanced. Although many explanations were eliminated, no expert ever articulated a reliable and admissible theory of what caused the failure. One set of hypotheses excluded external factors, identified the place of failure, but never identified the mechanics or cause of failure; this is the circumstantial-evidence-only theory, which asserts a generic regulator manufacturing defect without specifying any particulars. Another hypothesis, presented by Dr. Crane but without adequate scientific support and without proof of causation, blames the failure on the design of the range by DCS. The Crane opinion (which the court had previously found to have significant shortcomings) was largely

excluded by the court by rulings in limine. Nonetheless, the plaintiff chose to present it as the only specific theory of failure. Because the theories of the plaintiff as actually presented at trial required some showing of defect or negligence, and because inadequate proof was introduced, under Kentucky products liability law, the court will enter judgment as a matter of law in favor of defendant under Fed. R. Civ. P. 50.

DATE:




cc:     counsel of record